IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KURT E. CALLOW,

                              OPINION AND ORDER

          Plaintiff,

                              18-cv-371-bbc

     v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Kurt E. Callow contends that defendant American Family Mutual Insurance Company terminated him from his job as a physical damage claim field senior adjuster because of his age and because he complained about age discrimination, in violation of the Age Discrimination in Employment Act. 29 U.S.C. § 623. Defendant has filed a motion for summary judgment, contending that it fired plaintiff because of his poor attitude and insubordinate conduct, and not because of his age or any protected activity. Dkt. #19. Because I conclude that plaintiff has failed to present evidence from which a reasonable jury could conclude that defendant fired him because of his age or protected conduct, I am granting defendant's motion for summary judgment.

      From the parties' proposed findings of facts and responses, I find the following facts to be material and undisputed unless otherwise noted. I note that plaintiff responded to several of defendant's proposed findings of fact by stating "disputed," and then adding several sentences of additional facts or quotations from plaintiff's deposition testimony. In

1

many instances, plaintiff's responses do not clarify the nature of his dispute with defendant. These responses violate this court's summary judgment procedures, which direct parties who dispute a proposed fact to "state your version of the fact and refer to evidence that supports that version." Pretrial Conference Order, dkt. #9, at 7. Therefore, unless plaintiff's dispute regarding a proposed fact was obvious and clearly supported by his citations to admissible evidence, I have treated defendant's proposed facts as undisputed. As for plaintiff's own proposed findings of fact, he proposed several facts that consisted of compound statements from his deposition testimony, without stating clearly what factual proposition he was trying to establish. He also proposed several factual conclusions that were not supported by any evidentiary citations. I have disregarded any factual propositions that were not supported by evidence in the record.

UNDISPUTED FACTS

A. The Parties and Background

Plaintiff Kurt Callow lives in Rhinelander, Wisconsin. He worked for defendant American Family Mutual Insurance Company for 28 years. From 2006 until June 1, 2016, when he was terminated, plaintiff worked out of his residence in Rhinelander as a physical damage claim field senior adjuster.

Plaintiff was on a team of claim adjusters providing coverage for northern and northeast Wisconsin. Mark Pawlowski managed the team, which consisted of seven physical damage field adjusters, including plaintiff. In June 2016, plaintiff was 55 years old. The

2

other members of the team were ages 31, 32, 40, 46, 46 and 55.

Physical damage claim adjusters primarily resolve claims made by defendant's customers regarding vehicle damage. As a field claim adjuster, plaintiff personally inspected most of the vehicles for claims he was assigned. Claims that could be handled without visual inspection were referred to as "desk claims." Defendant encouraged claims adjusters to handle claims without visual inspection if possible.

Plaintiff and the other team members worked primarily on claims in their region, but when storms, vacations or short-staffing increased claims in another region, plaintiff and other adjusters would be asked to volunteer to help settle the claims outside their region. Adjusters got their claim assignments from an electronic "queue." Managers placed assignments in the queue for each territory, and then team members picked them up as they had availability. If assignments were placed erroneously in the wrong region's queue, plaintiff had the authority to move them to another region's queue.

In 2014, defendant instituted a pilot program that was intended to channel claims to field adjusters who had more availability. The program eliminated the field adjuster's specified boundary coverage, required field adjusters to handle claims outside their traditional territory and required them to process more claims from their desks. The channeling strategy was implemented company-wide, with the main goal being to distribute the workload more efficiently among adjusters. As a result of the program, and reduced staffing, plaintiff's territory and number of assignments increased.

B.  July 4, 2014 Assignments

During the July 4, 2014 holiday work week, Pawlowski's team had to handle extra claims because people in other regions were on vacation.  By July 3, plaintiff had handled three claims that were out of his area.  That same day, Pawlowski assigned plaintiff two additional losses from a bordering territory.  Plaintiff accepted one of the assignments, but placed the other one back into the electronic queue.  Pawlowski sent a message to plaintiff, asking why the second claim was back in the queue.  Plaintiff responded that he had accepted one of the claims, but had put the other back.  Pawlowski told plaintiff to keep both assignments because plaintiff had fewer pending claims than the next closest adjuster.

After receiving Pawlowski's message, plaintiff sent an email to defendant's human resources department, stating that he was having difficulties with his manager, that he was being assigned claims out of his current area and that it was unfair that he and other adjusters had to pick up other work because of reduced staffing.  Dkt. #22-1.  Plaintiff also complained to Dan Wilson, another manager, and raised concerns about Pawlowski's handling of the extra-territorial claims. Cindy Byington, an employee relations specialist for defendant, was assigned to investigate plaintiff's complaint.  After interviewing Pawlowski, Wilson and plaintiff, Byington concluded that plaintiff's dissatisfaction was an operational issue, and not a matter that required intervention from human resources.  Wilson then explained to plaintiff that there were times when extra coverage was needed because of vacations, storm activity or for other reasons, and that it was defendant's expectation that adjusters complete assignments that they are given.

4

C. October 29, 2015 Assignments

On October 29, 2015, Pawlowski assigned plaintiff two new losses to cover. Plaintiff asked Pawlowski what he should do with the assignments that he had already scheduled for the next day, and Pawlowski responded that plaintiff should schedule the new assignments the best he could. Plaintiff responded:

> Let me just make one thing clear. If the idea because of shortness in staff, is to spread everyone's territory to an extreme impossibility of providing excellent customer service and safety of the employee. . . I'm not in on that. . . I moved from Merrill up here and am not going to handle claims in that area and areas that need to be handled by someone closer. . . .

Dkt. #21-2.

Pawlowski contacted plaintiff about his message and explained defendant's channeling pilot program. During the conversations, plaintiff stated that he was unwilling to provide boundary-less desk coverage, even though his total claim count was less than those of other adjusters. Pawlowski told plaintiff that he wanted to balance the unit's workload and that he would like to see plaintiff assist more. Plaintiff told Pawlowski he would think about it.

On November 11, 2015, Pawlowski called plaintiff again to discuss workload balancing, and plaintiff responded that he could not speak to Pawlowski because he was on his way to Madison to discuss the topic with Bill Westrate, defendant's chief operating officer. Pawlowski was concerned that plaintiff was not willing to discuss the matter with him and that plaintiff had not told Pawlowski he would not be working that day. Pawlowski reported plaintiff's actions to Tom Hendricks, Pawlowski's direct supervisor, and Byington, in human resources. Byington decided that because plaintiff was meeting with Westrate,

5

they should wait to see whether Westrate had any suggestions or instructions before they took any action.

### D. Thanksgiving 2015 Assignments

During the week of Thanksgiving in November 2015, one of Pawlowski's peer managers, Dennis Babiarz, assigned four losses to plaintiff for coverage. Babiarz explained that several employees were out and he was not expecting plaintiff to make immediate field inspections of the losses, but did want plaintiff to make an initial telephone contact with the insured customers. Plaintiff responded to Babiarz in an email the same day stating, "Sorry Dennis. I'll be calling on this tomorrow to someone other than you." Dkt. #20-1. Babiarz forwarded plaintiff's email to Pawlowski and Hendricks, stating that he was not sure what plaintiff meant. Babiarz explained further that he had assigned the losses to plaintiff because plaintiff had only three assignments pending, while the other team members had between seven and 14 losses each.

Plaintiff forwarded Babiarz's email to Angela Himegarner, the associate vice president for auto physical damage, and wrote to her that he did not think that the claims were assigned properly because they were outside his normal territory and that he would not be able to provide exceptional customer service. He stated that his plan was to send the assignments "back to the queue for correct handling." Dkt. #20-2. Plaintiff sent the four assignments back to the queue. Ultimately, plaintiff handled three of the four claims, and Babiarz assigned the fourth to a different adjuster.

6

On December 7, 2015, Pawlowski had a conference call with Hendricks and Byington regarding plaintiff's response to Babiarz the previous month. They discussed how to handle plaintiff's behavior and his resistance to defendant's business decision to pursue a boundary-free assignment protocol. They decided that Pawlowski would speak with plaintiff and make it clear that he was being asked to supplement his fieldwork with desk work, just like everybody else.

Pawlowski called plaintiff on December 9, 2015. Pawlowski told plaintiff that he was concerned about plaintiff's conduct, including plaintiff's trip to Madison to speak with Westrate, plaintiff's refusing assignments sent to him by managers, his insubordinate tone in his communications with Pawlowski and others and his general unwillingness to support defendant's channeling strategy. Pawlowski told plaintiff that if he continued to have performance problems, defendant would consider corrective measures, up to and including termination of his employment.

Despite Pawlowski's concerns, plaintiff received a pay raise in March 2016, after receiving a positive performance review from Pawlowski.

E. April 16, 2016 Email Exchange

In April 2016, plaintiff was assigned to help an adjuster in Georgia process open Georgia loss files. (Hendricks, who was Pawlowski's supervisor, also managed the Georgia region.) During an email exchange about Georgia tax issues, plaintiff wrote to the Georgia adjuster, "Since you're an expert at Georgia tax just do it. In the time wasted it could have

7

been done. I don't plan on doing enough totals in GA to figure that out." Dkt. #21-5. The adjuster thought plaintiff's email was unprofessional and forwarded it to her manager, who contacted Pawlowski.

Pawlowski called plaintiff to discuss the matter. Plaintiff stated that he should not be working on files in other states. (Defendant says that plaintiff raised his voice to Pawlowski, but plaintiff denies doing so.) Pawlowski told plaintiff to complete the file, and plaintiff responded that he had to go and that he did not have time to take care of it. Plaintiff ended the call. Approximately 10-15 minutes later, plaintiff called Pawlowski back, telling him that he had called Hendricks because plaintiff felt Pawlowski was being aggressive toward him. Hendricks and Pawlowski then discussed the matter and decided to advise Byington of plaintiff's behavior.

Hendricks told Byinton he thought plaintiff's conduct showed a lack of team work and insubordination and that he would talk to plaintiff. Hendricks then spoke with plaintiff. Plaintiff stated that his email exchange with the Georgia adjuster was intended to be a compliment because she was an expert in Georgia. Plaintiff also repeated his feeling that he was being given too much work and that he did not agree with the philosophy of channeling claims work outside an adjuster's territory. Plaintiff later emailed Hendricks that he was going to take the Georgia issue "up at a different level" because he did not think the problem would ever get resolved based on Hendricks's tone. Dkt. #20-6. Hendricks summarized his discussion with plaintiff to Pawlowski and Byington.

F. Georgia Assignments

In May 2016, Hendricks made the decision to assign plaintiff to provide interim coverage in Georgia for a claims adjuster who was resigning. Plaintiff would not need to travel to Georgia, but would assist from home. Before deciding to assign the work to plaintiff, Hendricks assessed coverage options and current workloads. He also talked with other branch claim managers about taking some of the work, but that there was very little capacity in the field.

Between January 1, 2015 and June 2016, the team members on Pawlowski's team averaged 916 total claims. The range was from a low of 269 (for a team member who worked only five months during the period) to a high of 1,221 claims. Excluding the team member who had worked only five months, plaintiff had the lowest number of claims at 668. Pawlowski's team members all worked on out-of-state claims. One team member had approximately 58 out-of-state claims, almost all of which were in Georgia, and his total production was 1,150 claims for that time period. Among all of Hendricks's teams, 36 adjusters worked on Georgia claims between January 1, 2015 and June 2016. The range was a low of one claim to a high of 220, with the average for the group being 19 claims. Plaintiff had 12 Georgia claims during this time period.

On May 10, 2016, Pawlowski called plaintiff to tell him that he would be covering Georgia claims work on a temporary basis. Pawlowski stated that the decision had been made based on field productivity and who the company believed could best cover the work in the field. Plaintiff told Pawlowski that he was not comfortable with the decision, was not

9

trained in handling Georgia losses and that he wished that he had been asked rather than told. Plaintiff also told Pawlowski that he could not do the work because of his age. Plaintiff told Pawlowski that he wanted to speak with Hendricks's manager before he accepted the assignment and he told Pawlowski that he would be calling Angela Himegarner. Pawlowski told plaintiff that he would be around later that afternoon if plaintiff wanted to discuss the matter further.

Plaintiff emailed Himegarner, stating that he thought a local person in Georgia who knew the area and the local agents better should be assigned the Georgia work. He also stated that he did not have good signal strength while traveling in his vehicle and that customers in Georgia did not answer phone calls from a Wisconsin number. Plaintiff asked Himegarner to help identify an individual who would be better for the position. Himegarner responded that plaintiff should talk with Hendricks and contact her again if he still had concerns. He responded that he had not talked with Hendricks because Hendricks made the decision without consulting him. Himegarner reiterated that plaintiff needed to discuss the issue with Pawlowski and Hendricks. Himegarner later forwarded the email chain to Byington in human resources.

Hendricks and Pawlowski decided that they would meet with plaintiff and that if he refused to take the Georgia claim assignment, they would terminate his employment. Hendricks emailed plaintiff, asking him to continue the discussion about the Georgia claims and telling him that he had set aside time to meet with him in person in Wausau at 3:00 p.m. the next day. Plaintiff responded that he would not meet with Hendricks at that time

10

and that he would address his concerns with human resources.

G. Plaintiff's Internal Complaint

On May 11, 2016, plaintiff filed an internal complaint with human resources that stated:

> I am requesting a review of harassment from my manager and his branch manager. Their names are Mark Pawlowski and branch manager Tom Hendricks.
>
> . . . .
>
> Last week I exchanged a few emails . . . with Mr. Hendricks regarding a [Georgia] claim. I felt the tone of a message [the Georgia adjuster] sent was a bit negative. Mr. Hendricks and I talked and he said he would get back to me regarding it sometime this week. Yesterday, my manager Mr. Pawlowski called about 1:20 in the afternoon and said that [the Georgia adjuster] is leaving the company and after looking at every person in Tom's unit, I will need to handle her work until a replacement is found in 6-8 weeks. I had no discussion with Pawlowski at all prior to the call. I feel Hendricks wants me to handle her DESK work because it might have been my request about [the Georgia adjuster's] email that caused her to leave and that Hendricks wants to retaliate by having me do her work.
>
> Pawlowski should know better that a Field Physical Damage employee does not have the ability to handle field inspections and somehow be available to do a heavy load of Desk work. . . I feel the request is Economic harassment that significantly will change workload and would make providing first in class customer service almost impossible reflecting negatively on my performance. I do not know anything about how Georgia laws, paperwork get done and there are a number of issues with my territory that would make this work very difficult. I question if Pawlowski knows my age would make this extremely hard since we have enough to try and remember with what we do on a daily basis. Pawlowski said it's not a matter of me accepting it which made me feel like I have to or I'm fired. After 28 years of service.

Dkt. #22-9.

Plaintiff's complaint was assigned to Ken Licht, an employee relations specialist. Licht contacted Hendricks about the complaint and asked him whether plaintiff's email to the

11

Georgia adjuster had motivated Hendricks to assign Georgia desk claims to plaintiff. Hendricks told Licht that it had not. Licht asked Hendricks whether he was reassigning plaintiff based on his age, and Hendricks told him no. Hendricks told Licht he thought plaintiff was just as capable of handling the assignment as anyone else and that he would not have assigned plaintiff to the Georgia claims if he did not think plaintiff was capable of doing it. Hendricks told Licht that plaintiff's Wisconsin territory could be covered easily by independent agents, and that because plaintiff had low productivity and experience in handling Georgia claims, assigning plaintiff to the Georgia claim work on a temporary basis was a logical decision. Licht challenged the production numbers that Hendricks had provided, stating that plaintiff's lower production numbers might be because of his large territory, low speed limits on the roads, bad weather and other things. Hendricks responded that an adjuster's drive time is calculated into the mileage assessments and that they distinguish between rural and metro routes. In addition, Hendricks told Licht that plaintiff was not the only adjuster to have been assigned to cover the Georgia territory. Others in his branch were helping on Georgia claims on a regular basis, including an adjuster located in Indiana. Licht concluded that Hendricks and Pawlowski had not retaliated against plaintiff and that plaintiff's age had nothing to do with the decision to assign him Georgia claim work.

## H. Plaintiff's Termination

After the internal complaint was found to be unsubstantiated, Pawlowski, Hendricks

and Byington met and reviewed the documentation regarding plaintiff's performance. Byington stated that if Hendricks and Pawlowski wanted to terminate plaintiff, the decision would be supportable. Hendricks confirmed that the rest of the management team supported the decision to terminate plaintiff. The management team concluded that plaintiff's behavior was unacceptable, disruptive, unprofessional and demonstrated that plaintiff was not supportive of defendant's business strategies. Hendricks and Pawlowski terminated plaintiff on June 1, 2016.

OPINION

Plaintiff contends that defendant terminated his employment because of his age and because he complained about age discrimination. Plaintiff's discrimination and retaliation claims are governed by the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), which makes it unlawful for an employer to, among other things, "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." The Act also prohibits employers from retaliating against employees for opposing age discrimination. Id. 623(d). Because plaintiff was 55 years old at the time he was terminated, he qualifies for protection under the Act, which protects individuals 40 years old and over. Id. § 631(a). To succeed on his claims, plaintiff must produce evidence from which a jury could infer that his age or protected conduct was a "but-for" cause of defendant's decision to terminate his employment. Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176 (2009); Ripberger

13

v. Corizon, Inc., 773 F.3d 871, 880 (7th Cir. 2014).

Plaintiff may satisfy his burden by introducing direct or circumstantial evidence that defendant fired him because of his age or his complaints of age discrimination. Skiba v. Illinois Central Railroad Co., 884 F.3d 708, 719 (7th Cir. 2018). Plaintiff may also proceed through the burden-shifting framework adapted from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. Under the burden-shifting approach, plaintiff must come forward with evidence showing that (1) he is a member of a protected class, (2) he was meeting the defendant's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably. Id. (citing Carson v. Lake County, Indiana, 865 F.3d 526, 532–33 (7th Cir. 2017)). If the plaintiff establishes a prima facie case, the burden shifts "to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" Carson, 865 F.3d at 533 (citation omitted).

"However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of her age [or protected activity]." Id. (citing Ortiz v. Werner Enterprises, Inc., 834 F.3d 760 (7th Cir. 2016) ("Th[e] legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action. Evidence must be considered as a whole. . . .").

In this instance, plaintiff makes three primary arguments in support his claim that defendant discriminated against him because of his age. First, he contends that defendant discriminated against by assigning him work outside of his territory. However, the evidence shows that all claim adjusters were assigned work outside of their territory. The extra-territorial assignments were unrelated to plaintiff's age.

Second, plaintiff contends that defendant assigned more extra-territorial work to him than to younger employees. However, he has identified no younger employee who was assigned less work or more favorable work than he was. In fact, he does not discuss any specific younger employee at all. Moreover, the evidence submitted by defendants shows that plaintiff was one of the lowest producing claim adjusters and that he handled a below-average number of extra-territorial claims.

Third, plaintiff contends that defendant discriminated against him by assigning the Georgia claims work to him in May 2016, but again, the evidence does not support him. The evidence shows that Hendricks assigned the work to plaintiff on a temporary basis because he thought plaintiff had the capacity to handle the work. The evidence also shows that many claim adjusters worked on Georgia claims.

Plaintiff also has no evidence to support his retaliation claim. Significantly, plaintiff has submitted no evidence showing that he complained about age discrimination. He never told any manager or human resources officer that he thought he was being discriminated against because of his age. Plaintiff argues that his May 2016 internal complaint is evidence that he complained about age discrimination, but his internal complaint does not mention

15

age discrimination. Instead, plaintiff stated in the complaint that completing extra-territorial work was difficult because of his age. Plaintiff admits that he also told Pawlowski that he could not handle complex work because of his age. In other words, it was plaintiff, and not defendant, who thought he was limited by his age. There is no evidence in the record suggesting that Pawlowski, Hendricks or any other employee of defendant had concerns about plaintiff's age or took any adverse action against him either because of his age or his complaints about age discrimination.

Finally, even if plaintiff had offered some evidence of discrimination or retaliation, defendant has offered legitimate, nondiscriminatory and nonretaliatory reasons for its decision to fire plaintiff: he had ongoing performance problems, including his refusal to accept assignments from manages and his poor attitude regarding defendant's business model. To show that these reasons are pretextual, plaintiff "must present evidence suggesting that the employer is dissembling." O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011). "[I]t is not 'the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.'" Skiba,884 F.3d at 724 (citations omitted). "To meet this burden, [plaintiff] must 'identify such weaknesses, implausibilities, inconsistencies, or contradictions' in [defendant's] asserted reason[s] 'that a reasonable person could find [them] unworthy of credence.'" Id. (citations omitted).

Plaintiff has made little effort to argue that defendant's proffered justifications for his

16

termination were pretextual. He argues that he was a good employee who provided excellent customer service and received positive performance reviews. He also contends that defendant's new strategy of assigning extra-territorial claims to adjusters is bad for customer service. However, these arguments do not suggest that defendant's proffered reasons for firing plaintiff are false. Plaintiff's evidence does not refute defendant's evidence showing that plaintiff had a poor attitude and refused assignments from managers. In sum, plaintiff's evidence is not sufficient to create a genuine dispute of material fact as to the reasons defendant terminated his employment. I find, therefore, plaintiff has failed to provide a basis for finding intentional discrimination or retaliation.

ORDER

IT IS ORDERED that defendant American Family Mutual Insurance Company's motion for summary judgment, dkt. #19, is GRANTED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 20th day of November, 2019.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge